HOLT, Associate Justice
(dissenting).
Appellant in the primary election of May, 1950, was elected by the Democratic voters of Hillsborough County, Florida, to the State Democratic Executive Committee, which is an organic and integral functioning part of the Democratic Party of Florida. In qualifying for- this office he took the required oath in which he solemnly pledged himself to vote for all nominees of his party including national, state and county, whose names appear on the ballot for the general election of that year (1950).' This he did.
As a committeeman and one of those into whose hands the destiny of the Democratic party was placed, his duty and responsibility was clearly defined and distinctly understood by all involved, and was written out by the Legislature of Florida in Section 130.121, Florida Statutes Annotated, as follows:
“103.121 Powers and duties of executive committees
“The state and county executive committees shall have the following powers and duties:
“(1) to adopt a constitution by two-thirds vote, of the full committee,
“(2) to adopt such by-laws as they may deem necessary by majority vote of the full committee,
“(3) to conduct their meetings according to general1 accepted parliamentary practice,
“(4) to make party nomination when required by law,
“(5) to furnish without charge upon application from any .prospective candidate a printed form of the sworn statement,
“(6) to conduct campaigns for party nominees,
“(7) to do-anything that is considered by custom and practice as proper for party committees,
“(8) to make assessment it requires of candidates, for the purposes of meeting their expenses or maintaining their party organization, not later than January 15th of each year in which a general election is held. No executive committee shall levy assessments to exceed two percent of the annual salary of the office sought by any candidate. .
“Within five days the state executive committee shall deliver a certified copy of the assessments to the secretary of state. The county executive committee, shall deliver their certified copy *325 to the clerk of the hoard of county .'commissioners. The certified copies áre filed by the secretary of state, and by the board of county commissioners. The county executive committee shall have exclusive power to levy assessments upon candidates to be voted for in a single county except state senators and the state executive committees shall have exclusive power to levy all other ‘assessments authorized. Upon payment by a candidate of his filing fee and committee assessment, he is entitled to receive a receipt from the officer with whom he qualified. When the executive committee shall nominate a candidate to fill a vacancy, they shall have exclusive power to levy assessments upon all candidates at the time who are seeking nomination and the candidates shall pay their assessments to the proper authority,
“(9) to declare by resolution for the nomination of candidates for other than elective offices, and for president and vice-president of the United States. Upon adoption of a resolution, and upon service of a certified copy thereof upon the secretary of state, within the time required for filing sworn statements by candidates, the names of candidates for such, offices and positions shall appear upon the official primary election ballot. The form of the ballot shall correspond to the form prescribed in § 101.141,
“(10) and a quorum shall be a majority of those elected.. Laws 1949, c. 26329, § 9; Laws 1949, c. 25389, § 1; Laws 1951, c. 26870, § 7.”
Even a casual reading of this statute just cited emphasizes that appellant in his official capacity as an officer of the party receives money in the form of qualifying fees of Democratic candidates in the primaries after having assessed the amount to be paid with other officers similarly qualified and situated, and thereafter expends same for party purposes, which included assistance and. advancement to its nominees; to conduct campaigns for party nominees'; and many other duties and responsibilities not necessary to detail here.
There, is nothing in the record that ap1-pellant did not discharge his responsibilities' in this connection for the year 1950, and there is no complaint here on that score, so we must assume he conducted himself satisfactorily as a committeeman until September 19th, 1952, when in his official capacity as a Democratic Committeeman he addressed a letter to the Chairman of the State Democratic Committee (which letter was routed by way of the two local daily newspapers of Tampa, Florida, and given great publicity, not only in Hillsborough County, but throughout the entire State), in which appellant flatly stated thqt he would support all of the nominees of the Democratic party in the general election of 1952, but would not support and would not even vote for the Democratic nominees of the Democratic party for President and Vice President of the United States of America, but on the contrary would vote for the nominees of the opposition Republican candidates for these highest offices in the land.
The intense furore which followed the injection of this letter in the highly charged political atmosphere existing at that time, (September 1952) was only natural, with those who desired defeat of the Democratic party at any cost, rejoicing at gaining such a recruit, as appellant, a Democratic Executive Committeeman and those (as ap-pellee), who were loyally carrying out their obligations taking prompt action to preserve the Democratic party and keep it functioning and operating as it was intended by party regulation and statutory authority, by promptly ■ filing in the court below its information for writ of quo warranto seeking ouster of appellant' from his office as Democratic Executive Committeeman. This was granted and he was ousted' from his office as Democratic Executive Committeeman by the learned trial Judge from which decree this appeal was lodged.
Appellant at the outset poses the sole question as to whether his actions as de *326 scribed, constitutes legal ground for his removal from office, particularly where the statutory method for removal in his case was not used, but specifically waives any suggestion of any insufficiency of the information in quo warranto.
This simplifies the issue before this court. Before beginning discussion of the main point involved herein, we say, and emphatically so, that the situation brought about by the actions of the appellant could just as well occur in the Republican party as the Democratic party, and to this case and its eventual aftermath, will have its effect just as decidedly upon one party as the other. This should be borne in mind at all times.
Appellee pursued the correct remedy in the lower court by the use of information in quo warranto. We answer that portion of appellant’s one question first, and thus dispose of it to devote our attention to the challenge to all organized political parties in this country as laid down by appellant.
We have held and it is settled law that quo warranto in matters of this kind is the proper remedy. State ex rel. Feltman v. Hughes, Fla., 49 So.2d 591; State ex rel. Watkins v. Fernandez, 106 Fla. 779, 143 So. 638, 86 A.L.R. 240; State ex rel. Pooser v. Wester, 126 Fla. 49, 170 So. 736; State ex rel. Page v. Dannelly, 139 Fla. 320, 190 So. 593.
We now turn our attention to the merits of the cause presented to us. It resolves itself simply into the proposition whether a member of the State Democratic Executive Committee can while holding that office within the party structure, expend its funds, direct its activities, determine the policies it should adopt and pursue, assist certain of its nominees, at the same time vote for and advocate the election of rival nominees of the Republican party to the office of President and Vice President over and above the nominees for the same offices of his own party, and after having pursued such a course retain his office in the Democratic party ?
In a hotly contested political campaign, •an answer to the above question could be easily brushed aside or artfully explained to the eager partisan participant, to the satisfaction of many who were only interested in the success of their “cause” at the polls. To some it may be said that their justification for such conduct was that “any means justifies the end”.
But that time has now passed; the election is over; the victorious Republican nominees with the help of the appellant- — ■ a Democratic Executive Committeeman- — • have been installed as President and Vice President of the United States; their administration has now taken over the direction of our country; political passions generated in the battle of ballots have slowly subsided; calm and considerate reason has now reassumed its place in our scheme of thinking; and viewed in the cold light of today the issue and question we face in accordance with the facts surrounding the actions of the appellant, in all fairness and honesty, can only elucidate one answer: appellant forfeited his right to his office in the party when he went counter to his oath of office, and the statutes of the State of Florida relating to the same. But far more important than these violations (as major as they are) is the general proposition that one, whoever he may be, cannot deny that which gave him his life (and here we mean political life). The Democratic party and its members promoted appellant to the position he held, which he used so effectively against it and them.
We do not question, nor do we quarrel with appellant as to his right to vote, work for and support any candidate of his choice, regardless of political affiliation, as a private citizen. This is the fundamental right of every American voter and it should never be abridged nor qualified in any way. But, when as appellant did, offer himself as a candidate for an office within his party (in a contested election), and is successful in convincing a majority of the Democrats voting in the primary for that purpose, that he is the best man for them (the democrats) to assist in operating the party for *327 the best interests of all Democrats, nominees or not, he becomes lawfully bound, so long as he holds office in the party, and exercises authority therein, to fully and energetically and faithfully comply with and abide by his oath of office, the law regulating same, and is both legally and morally obligated to work for and help his party, and all of its nominees, and not to destroy it from within by such actions as appellant indulged in here. Destruction from within has always been the most effective manner to destroy institutions, countries and nations. Need we recall the wooden horse of Troy of ancient times-; infiltration of enemy lines by saboteurs in all wars of all times; the fifth column of World Wars I and II; and that today, we face the ever constant threat of communism invading high governmental echelons of our country?
The case of Mairs v. Peters, Fla., 52 So.2d 793, 795, is completely decisive on this point, wherein we said:
“Conceding, as any student of free government must, that the party system is essential to our political life, we can well understand how short lived the party would be unless some means was afforded to maintain party integrity.
“Those who will not maintain their party through pride or loyalty may be restrained by law from destroying the system they have utilized to advance their political fortunes.”
However, as compelling as the conclusions already reached, may be we are constrained to look to the broad general principle squarely facing us in this case which may have been everlooked in the argument and the briefs submitted.
Our nation has grown powerful and great and is now the leader of the free world through the ability to maintain and operate our Democratic institutions, under the Constitution by the aegis of two major political parties: — the Democratic and Republican for almost the entire life of our nation. These have been the great stabilizing factors in our political, economic and governmental activities, thereby assuring a continuance of a strong nation without violent, numerous and disastrous interruptions.
For the past fifty years we have witnessed throughout the world governments beset and plagued by so-called “splinter parties”, numbering in some instances from fifty to one hundred — with no one able to acquire a majority and the necessary authority to govern and to maintain confidence, preserve order, make progress or plan for the future. What has followed is a familiar picture to us all. Countries have stagnated; — chaos, uncertainty and fear become the usual product of such situations and the people, 'business, and every worth while activity is silenced, and poverty with her hand maiden hunger eventually result. In some instances unhealthy alliances, and deadening compromises have been reached only to drift without guidance to the next election which might be a few weeks, months or as long as a year, and produce no better answers. It is a form of national suicide and nations so affected soon fall prey to totalitarian forces of communism, not from any desire to do so, but only on account of their own national weakness produced by their inability to solve their pressing problems because of instability generated by their numerous parasitical political parties.
Appellant strenuously advocates a Democratic party for Florida, and that it sever and divorce itself from the National Democratic Party. If his views were to prevail and the same be adopted by both major political parties, then we might be saddled with 48 different Democratic parties with 48 candidates for President and Vice President of the United States, and 48 Republican candidates for the same office. Thus we would be faced with the enervating, deadening frustration of the system which now is strangling many countries abroad today.
However, no one under our system is compelled to join, nor remain in, any particular party. One can change as often as may be desired, or remain aloof from any such organization, nor do we intend by *328 anything that may be said here to coerce anyone to do other than he or she may desire.
We only point to the inherent dangers facing us as a nation based upon past experience and example, if the contentions of appellant were to prevail and be accepted by the people.
All other contentions of appellant have been examined and found to be without merit, and the decree should be affirmed.
For the reasons stated, I dissent.
ROBERTS, C. J., concurs.